WILLIAM RUSSELL ALLEN *et al.*, Appellants, v. THE CITY OF· DAVENPORT, *et al.*

**Municipal Corporations:** DEBT.  A contract for a street improve-- ment under which a city agrees to pay a specific sum at a stated time is a· debt within the constitutional inhibition against incurring indebtedness in excess of five per cent. of the value·of its. taxable property, where the contractors are under no obligation to accept the proceeds of local assessment bonds or the amount derived from such assessments on abutting property, and the city· has no funds which it can lawfully use to meet the payments as; they fall due under the contract, and has issued bonds and levied assessments to reimburse itself for the amount to be paid to the· contractors.

SAME.  Bonds issued for the purpose of providing a city with·funds for which it may reimburse itself for amounts paid to contractors. under a contract creating an indebtedness on the part of the city in excess of the constitutional limit are void although bearing on their face the condition that they are payable only out of a pav-- ing fund created by the collection of a special tax levied on abutting property.

SAME.  After a city's indebtedness has reached the limit fixed by the· Constitution, Article XI, section 3, it cannot make a contract binding it conditionally to pay for paving a street, though it contemplates a reimbursement for such payments from the proceeds of the sale of bonds which do not increase the indebtedness within said section, being payable from special taxes for the paving.

SAME.  Bonds payable out of a special tax for street paving are· invalid where they are issued for the purpose of reimbursing the· city for money paid by it to the contractor for the paving under a contract that was void, because creating an indebtedness beyond. the limit fixed by the Constitution, article XI, section 3.

SAME.  An assessment for street paving is invalid, where it is made· for the purpose of reimbursing the city for money to be paid by it to the contractor for the paving under a contract that was void because creating an indebtedness beyond the limit fixed by the· Constitution, article XI, section 3.

SAME.  Money raised by assessment on land for paving certain streets. is a trust fund, and cannot be lawfully appropriated by the city to pay for paving other streets, and a city applying a fund raised by an assessment on land for paving certain streets to pay for·

paving other streets, becomes indebted to such fund, and increases its indebtedness, within Constitution, article XI, section 3, fixing a limit to its indebtedness.

BONDS.  City bonds are not invalidated by a misrecital therein respecting the particular act of Assembly under which the ordinance authorizing the issuance of the bonds is passed.

City Taxes:  EXEMPTION.  Lands within the limits of a city, portions of which are used for farming, lumber yards, a stone quarry and ice house, a part rented for pasture and another for a nursery, and which adjoin or have upon them municipal conveniences such as light, patrol boxes, and the like, are not occupied and used in good faith for agricultural purposes so as to be exempt from taxes for city purposes

SAME.  A special assessment for street paving is not a "tax for city purposes" within acts Twenty-third General Assembly, chapter I, section 3, exempting lands in a city used for agricultural purposes from such tax.

ASSESSMENT RULE.  The front-foot rule applied to the assessment of land abutting a street for paving the street will be sustained, though the assessment exceeds the benefits conferred.

TAX PAYERS.  Where a lot owner sued to cancel an illegal contract of the city with the contractor to pave the street before much work had been done under the contract, and before bonds payable out of the special tax on abutting lots had been sold, or an assessment had been made, the fact that the work under the contract was completed, and the bonds issued and sold at the time of the trial, will not be considered as curing the illegality.

Estoppel.  A tax payer cannot object that an assessment for paving a street is illegal because it includes the cost of grading and a charge for interest, without tendering the amount of the assessment which is valid, since such objection does not go to the validity of the whole tax.

SAME.  An assessment for paving a street is not invalid in toto because the cost of grading and interest is included therein.

Contract:  PAVING.  The statute making it incumbent on a city to establish the grade of a street before paving it, does not preclude the city from ordering the paving and making the contract therefor before it has established the grade, where the contract is made with reference to a proposed grade, which is established before any work is done.

RULE APPLIED.  A municipal ordinance fixing a grade is not jurisdictional and need not precede the resolution ordering the improvement, where it is passed so that the work is done with reference thereto, and so that the owner may not be subjected to damages by reason of a subsequent change without compensation therefor.

SAME.  Though a city cannot assess an abutting lot-owner for money expended merely to grade a street, it can include in a paving

5   assessment such cost of excavating as would be reasonable and necessary to prepare the surface for paving.

SAME. A contract by a city with a paving contractor requiring the contractor to replace defective work at any time within two years, 6   and providing that, if he fails to do so, the city may replace it and recover the expense of him and his bondsmen, does not provide for an expenditure for repairs of streets, within Code, section 465, requiring the city to pay for such expenses out of the general fund.        *

Statute: ORDINANCES: *Repeal.* An act expressly repealed in a stat- 1   ute under which a municipal ordinance was placed and enacting a substitute therefor does not affect the ordinance if in harmony with the new provisions.

RULE APPLIED. Acts Twenty-fifth General Assembly, chapter 7, authorizing ordinances for street improvements, and repealing act Twenty-third General Assembly, chapter 14, containing similar 1   provisions, does not make it incumbent on a city which has enacted an ordinance for such purposes, under chapter 14, to re-enact the ordinance after the passage of chapter 7, to which the ordinance is not repugnant.

ORDINANCES. A failure of a city to comply with a charter provision 2   that all ordinances shall be recorded, does not render the ordinances void, the provision being merely directory.

*Publication.* A city charter requiring ordinances to be recorded in a 2   book kept for that purpose, is complied with by a publication of the ordinances in book form.

*Presumption.* Ordinances published in book form will be presumed to have been signed by the mayor in the absence of evidence to 3   the contrary, where the city charter provides that such books shall be received in evidence without further proof.

*Appeal from Scott District Court.*—HON. C. M. WATERMAN, Judge.

SATURDAY, DECEMBER 17, 1898.

SUIT in equity to enjoin the defendant city from executing or carrying out a contract for paving and grading a street which runs through plaintiff's land, from borrowing the money to pay the expenses of such work, from selling or negotiating any bonds based upon special assessments for the work, and from assessing, levying or collecting any special tax upon or against plaintiff's land. Plaintiffs claim that the land is used

and occupied in good faith for agricultural purposes, and is exempt from liability for city taxes; that the contract with Flick & Johnson, the contractor who did the paving, is void, for the reason that the preliminary requirements of the law were not complied with; that no permanent grade of the street through plaintiff's land had been established at the time the contract was made; that the contract for paving bound the city to pay the price agreed upon; and that, as it was at the time indebted beyond its constitutional limit, such contract is void. Plaintiffs further say that the city has issued and is about to negotiate its bonds to pay for the improvement, and that said bonds are invalid, because of the constitutional inhibition; that the city has levied a special assessment against their property; and that part of the sum so levied is for grading the street, and is therefore illegal; and that the tax was levied for the purpose of paying the debt created by the city by the issue of the bonds and the making of the contract with Flick & Johnson; and that such indebtedness, being in excess of the constitutional limit, is void. Some other claims are made, which will be referred to in the body of the opinion. The city denied most of the allegations of the petition, and asserted that all its proceedings in relation to the improvement of the streets, and in providing for the payment of the expenses thereof, were regular and valid, and claimed that the special assessment against plaintiffs' property was legal and valid. The trial court dismissed plaintiff's petition, and they appeal. —*Reversed.*

*W. T. Dittoe, Wm. Chamberlin* and *Hiram Grover* for appellants.

*E. N. Sharon* for appellees.

DEEMER, C. J.—This action was originally commenced by Ann R. Allen. After it had been pending some time, Mrs. Allen died, and plaintiffs succeeded to her interests. Mrs. Allen and her husband, Thomas Allen, some time deceased,

held title to a tract of about two hundred acres of land,
lying within the limits of the city of Davenport, and abutting
upon a part of the platted portion thereof, under a trust
deed which gave them a life estate therein, remainder over
to the children of Mrs. Allen, who are also plaintiffs in this
case. A highway, known as the "Davenport and Le Claire
Road," runs through this land, almost parallel with the Mis-
sissippi river, which river forms one of the boundary lines
of the land. This road is a continuation of what is known
as "Eddy street." Prior to the year 1890, this land was out-
side the city limits. In May of that year, however, the city
extended its limits so as to take in the whole of the property.
In June of 1896, the city council of defendant city passed a
resolution for extending, curbing and paving said road,
and sometime in September of that year, entered into a con-
tract with Flick & Johnson for furnishing the material and
doing the work contemplated by the resolution. The work
was to be completed on or before November 1, 1896, to be
paid for in installments, and the contractors agreed to keep
the improvement in repair for the term of two years after the
work was completed. An ordinance establishing the perma-
nent grade of the road and street was passed September 2,
1896, published September 8th, and took effect September
19th. On September 2, 1896, the city council, by resolution,
directed the issuance and sale of paving bonds, the proceeds
to be applied in payment of the improvement. This resolu-
tion provided that the bonds should not be sold for lesss than
par, and that the proceeds should be applied as provided in
section 9, chapter 7, Acts Twenty-fifth General Assembly.
None of these bonds could be sold until after the November,
1896, election, although the work progressed and payments
therefor were made out of the general or special paving funds
of the city, as directed by the city council. The work was
completed the last of November, 1896. On the third day of
February, 1897, the city council made an assessment of the
proportionate cost of the improvement, amounting to the sum

of fourteen thousand six hundred and seventy-five dollars and twenty-six cents, against the plaintiff's property. This sum included a charge for interest, and a further sum for excavating the road, preparatory to the laying of the pavement. At the time the assessment was levied, all but three thousand and sixty-three dollars and eighty-seven cents of Flick & Johnson's account for doing the work and furnishing the material had been paid. But ten thousand dollars worth of bonds were sold during the year 1896, and but thirty thousand dollars when this case was tried, in January of the following year. The facts above recited are practically undisputed, and we now turn our attention to the different contentions urged upon us by appellants, taking them up in the order in which they are presented in the briefs.

I. It is insisted that the city had not acquired the necessary jurisdiction or power over plaintiff's property to enable it to order or make the improvement at the cost of the abutting property. This contention is based upon the proposition that the ordinance (designated as "No. 125") ordering and directing the improvement is void and of no effect, because the law under which it was enacted (chapter 14, Acts Twenty-third General Assembly) was repealed by chapter 7, Acts Twenty-fifth General Assembly, which took effect May 10, 1894. The ordinance referred to was adopted December 2, 1893. The act of the Twenty-fifth General Assembly expressly repeals the statute under which the ordinance was passed, and enacts a substitute therefor. But it seems to be well settled that when the repealing statute does not in express terms annual a right or power given a corporation by a former act, and only confers the same rights and powers under a new name, and with additional powers, such subsequent act does not annul the rights and powers given under its former name. The change of a city charter does not affect existing ordinances in harmony with new provisions. Dillon Municipal Corporations (4th ed.), section 85; *Trustees of Erie Academy v. City of Erie,* 31 Pa. St. 515. Now, the

statutes under consideration cover the same subject-matter, and are identical in most of their provisions. In so far as they are material to our inquiry, they are practically the same. This being true, there was no need for the re-enactment of the ordinance after the act of the Twenty-fifth General Assembly went into effect. The city council had the right to order the work, and by passing the ordinance and adopting the resolution directing the work, according to certain specifications, it acquired jurisdiction over the property. The bonds issued by the city council recite that they were issued under and by virtue of chapter 7 of the Acts of the Twenty-fifth General Assembly, and the ordinance passed in accordance therewith. This may be a verbal inaccuracy, but such a statement does not go to the validity of the instruments.

Again, it is argued that the ordinance is void because not signed or recorded as provided by the city charter and the laws of the state. Section 3 of the charter provides that all ordinances shall be recorded in a book kept for that purpose, and "the book, or a copy of any ordinance, * * * with the certificate of publication, * * * certified to by the clerk to be a true copy of [the] * * * ordinances, * * * shall be sufficient authentication to allow the same to be read * * * in evidence * * * in any court in this state, or when * * * the ordinance * * * shall be published in book or pamphlet form, purporting to be printed and published by authority, * * * the same shall be received in evidence in all courts * * * without further proof." Appellants offered in evidence what were known as and agreed to be the "Revised Ordinances of the City," consisting of 151 chapters, which were attested as follows: "Be it enacted by the city council of the city of Davenport: Section 1. That the foregoing shall constitute and be denominated the 'Revised Ordinances of the city of Davenport of 1893,' said Revised Ordinances being chaptered and headed as follows: [Here follows 'Chapter 1' to 'Chapter

150.']" Section 1 concludes as follows: "The foregoing, together with the rules and regulations of the board of health, rules and order of business, and police rules, as herein set out, are hereby adopted and ordered to be published in book form, and that one copy of said ordinances be posted in one public place in each ward of the city; and ten days from and after said publication the same shall be in force and shall be received without further proof, as presumptive evidence of such ordinance." Section 2 provides for the repeal of "all public and general ordinances, or parts thereof, not included in this revision," "so far as they conflict with the provision hereof." Some other exceptions are inserted in above section. "Passed and approved this 2nd day of December, 1893. Henry Vollmer, Mayor. Attest: N. C. Martin, City Clerk."

This also appears in the minutes of the proceedings of the city council: "The ordinance committee reported an ordinance for the grading, paving, curbing, graveling and guttering streets, highways, avenues and alleys (No. 125), and the manner of paying for the same. On motion, the rules were suspended, and the ordinance adopted by the following vote: Ayes: Beyer, Bischoff, Klein, Korn, Lerch, Leonard, Malloy, Parkhurst, Rehling. Nays: None." The city clerk also testified that the ordinance was printed in the minutes of the council proceedings; that he kept a book in which the ordinances are posted; and that this ordinance is found in that book. Thus, it is shown that the ordinance was duly passed, and a copy of it is printed, not only in the proceedings of the city council, but it also appears, duly certified, in the printed Revised Ordinances of the city. The section of the chapter quoted does not seem to require the recording of the ordinance in order to give it validity. That provision seems to relate to the method of making it proper and competent evidence, and, in any event, it is simply directory. Failure to comply with a directory statute with reference to the recording of ordinances does not affect their validity. *Irrigation Dist. v. De Lappe,* 79 Cal. 351 (21 Pac. Rep. 825); *Whalin*

*v. City of Macomb*, 76 Ill. 49; *Upington v. Oviatt*, 24 Ohio St. 241; *Ameg v. Allegheny City,* 24 How. 364; *Stevenson v. Bay City,* 26 Mich. 44. In any event we regard the publication of the ordinances in book form a sufficient compliance with the statute.

With reference to the claim that the mayor did not sign the ordinance, we do·not discover any evidence to establish that fact. Plaintiffs introduced the printed book of the Revised Ordinances of the city in evidence, and the charter of the city provides that such book shall be received in evidence without further proof. In other words, the introduction of the book made a *prima facie* case of the adoption, signing, and recording of the ordinance. No other evidence was introduced tending to show that the ordinance as passed was not signed by the mayor. Indeed, this matter seems to be an afterthought, first presented on this appeal.

II. Appellants further contend that the ,city had no power to order the improvement until a permanent grade had been established, and that, as this was not done until after the improvement was ordered and contract let, the whole proceedings are void. The resolution ordering the improvement adopted in virtue of Ordinance 125 was passed June 3, 1896. The contract was awarded August 19, but was not in fact signed until September 4th. The ordinance establishing the grade of the street or highway was passed and approved September 2, 1896, was published September 8th, and went into effect September 19th. It will be ·observed that the ordinance fixing the grade was in fact passed before the contract for doing the work was executed. ·But appellants insist that, as it did not go into effect until afterwards, the proceedings are void. Both the charter of ·the city and the general law provide that permanent paving shall not be done until after the bed of the street shall have been brought so near to the grade, as established by the ordinance of the city, as that such paving, when fully completed,

will bring the street fully up to the established grade.   Appellee's counsel practically concede that no such permanent improvement as that herein contemplated may be made until a grade for the street is established by ordinance, and this seems to be the holding of the courts.   Elliott Roads and Streets, p. 383; *Meyer v. Fromm*, 108 Ind. 208 (9 N. E. Rep. 84); *State v. District Court of Ramsey County,* 44 Minn. 244 (46 N. W. Rep. 349); *State v. Judges of District Court of Eleventh Judicial District,* 52 Minn. 241 (53 N. W. Rep. 800).

But he further contends that the ordinance fixing the grade was binding on the city from the time of its passage, and that it was in fact passed before the contract for the improvement was finally consummated.   He further contends that there is nothing in the law, the charter, or the ordinances of the city requiring the establishment of a grade at any particular time before the improvement is made, and says that, as the improvement was made with reference to the only grade which ever was established, appellants have no cause for complaint.   The contract provided that the streets should be excavated ten inches below the grade line, so that the ten inches of brick, sand, and foundation making up the pavement material would still leave the street at grade.   It was manifestly made with reference to the grade fixed in the ordinance of September 2d, and, as the contractors complied with the terms of their contract, it is clear that appellants' objection is merely technical.   We are constrained to hold that as neither the law nor the city charter makes the establishment of the grade a condition precedent to the passage of the resolution for the work, and as the purpose and intent of the law are to make such improvement permanent and not subject to change after it is once completed, without liability for damages by reason thereof, it is sufficient if the grade is established at such time as that the improvement may be made with reference thereto.   In other words, an ordinance fixing the grade is not jurisdictional, and need not precede the resolution ordering the improvement.   If passed so that the work

is done with reference thereto, and so that the owner may not be subjected to damages by reason of a subsequent change without compensation therefor, it is sufficient. What the rule would be if a grade had once been established and a change was intended before the permanent improvement was made, we have no occasion to determine, for this is a case where no grade had in fact been established until the passage of the ordinance of September 2d. True, stakes were set and gradient lines run before that date, but these were the preliminary steps taken to find a proper grade before ordering the work or adopting the grade ordinance. The bids were received with reference to the proposed grade, and the ordinance simply conformed to the grade as actually fixed by the engineer. In the case of *Bishop v. Tripp,* 15 R. I. 466 (8 Atl. Rep. 692), which was, in principle, quite like the one before us, it is said: "The sewer was ordered constructed two months before the portion of the street in which it was constructed was laid out and received as a public street. The sewer, however, was not actually constructed until after such portion was laid out and received. * * * We think, therefore, that this assessment was not invalid simply because it was ordered before the layout, inasmuch as before the construction the portion of the street where it was constructed became a public street."

III. The next point made is that the contract between the city and the contractors was illegal because it created an indebtedness in excess of the constitutional limit. We pass this for the present, as it is the main question in the case, to dispose of some other preliminary matters.

It is said that the assessment is illegal because it included the cost of grading the street and a charge for interest. It appears that a city has no power to assess the cost of grading its streets against the abutting property owners. But it is well settled that a reasonable amount of excavating in order to prepare the surface of the street for the finished improvement may be charged as part of the costs of

paving. Dillon Municipal Corporations (2d ed.), section 636; *McNamara v. Estes,* 22 Iowa, 246; *Schenley v. Com.,* 36 Pa. St. 29; *Buell v. Ball,* 20 Iowa, 282. If the natural surface of the street had been at grade, it would have required an excavation of ten inches in depth along the entire street. As it was, the average depth of the excavation was about eight inches, as we understand it. Surely this is not more than a reasonable amount in order to prepare the surface for the paving. But, aside from this, the point relied upon does not go to the validity of the whole tax; and appellants cannot be heard to complain of a part in order to defeat the whole, without tendering the amount which is valid. The assessment was made in such form that they could readily make a tender, had they been so advised. As sustaining our conclusions, see *Morrison v. Hershire,* 32 Iowa, 271; *Grimmell v. City of Des Moines,* 57 Iowa, 144. The last thought also meets appellant's objections to the interest charged.

IV. The contract with Flick & Johnson provided that: "The contractor will be required at any time within two years after the acceptance of the work, without additional compensation, to replace any soft, disintegrated, or defective tile, curbing, or bricks, or any material which proves after use to be inferior to the quality herein required, with material such as is herein required to make good any settlement or derangement in the surface of the roadway, gutters, or curbing which may have occurred within such two (2) years after the acceptance of the roadway, except what may have been caused by digging trenches after completion of paving; and if such contractor shall fail for ten days after notice in writing to replace said material, or to re-lay and make good such settlement, etc., the city shall have the right to do such work according to the requirements of the specifications, and recover the cost and expense thereof from said contractors and their bondsmen." It is clear that this is simply a guaranty of the quality of the work and the durability of the material, and not such an expense for repairs as is contemplated in section 465 of the Code, which provides

that the city shall pay for repairs of streets out of the general funds. *Osborn v. City of Lyons,* 104 Iowa, 160.

V.   Again, it is insisted that plaintiff's property has been occupied and used in good faith for agricultural purposes, and cannot be assessed for local street improvements. The statutes of the state provide that lands which are not laid off into lots of ten acres or less, and which are in good faith used and occupied for agricultural or horticultural purposes, shall not be taxed for any city purpose, except road taxes, which may be levied to the same extent as if they were outside the city limits. Plaintiffs Ann R. Allen and her husband, Thomas, held the premises for life, and to the end of the life-time of the longest liver, remainder over to the children of said Ann R. Allen in fee. The grantees had power to lease for a term of not exceeding twenty years, which leases were to continue notwithstanding the death of the trustees. The land has never been subdivided. It was annexed to the city in the year 1890, and the south, east, and north lines mark the boundaries of the city. What is known as "Churchill's Addition to East Davenport" abuts it on the west. The road which was paved was established in the year 1838. None of the plaintiffs live upon the land. It has been, and is now, used by tenants who have rented it for various purposes. There are six houses upon the property. About forty acres is used for farming, and the remainder is used for lumber yards, a part of it for a stone quarry, and some of it rented for the purpose of erecting an ice house thereon. Another part is rented for pasture, and still another for a nursery. The main street leading to the property is well lined with residences, and the street cars run within a block of the west line. At least one electric light is placed in the road after it enters plaintiff's property. The water mains join up to the line of plaintiff's land, and a hydrant is on one of the streets close to the line. A police patrol box is within one block. The buildings we have referred to are occupied by tenants who have their garden spots, but except as stated,

the land is not used for agricultural purposes. In the case of *Farwell v. Manufacturing Co.,* 97 Iowa, 286, we had occasion to construe the sections of the statute now under consideration; and we there held, in effect, that the mere temporary occupancy and use of the land for agricultural purposes, when purchased for speculation, with intent to lay out into lots and sell them, is not a good-faith occupancy for agricultural purposes. It is further said: "If, however, his main purpose in making the purchase of this land was to use it for ordinary agricultural purposes, and so far as it has been thus used and occupied, then we should say such use and occupancy had been, and was, in good faith." The test seems to be the purpose and intent of the owner. With this in view, it seems quite clear that plaintiff's use and occupancy is not in good faith for agricultural or horticultural purposes. See *Fulton v. City of Davenport,* 17 Iowa, 404; *Brooks v. Polk County,* 52 Iowa, 460. But we need not rest our conclusions upon this aspect of the case alone, for the case of *Farwell v. Manufacturing Co., supra,* holds, in express terms, that a special assessment is not a "tax for city purposes," within the meaning of the statute quoted.

VI. The front-foot rule of assessment is challenged, and it is also said that, as the assessments are not limited to the benefits conferred, the statute is unconstitutional. We have heretofore approved of what is known as the "front-foot rule of assessment," and have also said that the expense of improving streets has been too long imposed upon abutting property, without regard to benefits, to be now called in question. *Morrison v. Hershire,* 32 Iowa, 271; *City of Muscatine v. Chicago, R. I. & P. Ry. Co.,* 88 Iowa, 291. See *Warren v. Henly,* 31 Iowa, 31; *Gatch v. City of Des Moines,* 63 Iowa, 718; *Eagle Mfg. Co. v. City of Davenport,* 101 Iowa, 493. It may not be out of place to say that, if the proposition were an original one, the writer, and perhaps other members of the court as now constituted, would be strongly inclined to the view that such assessments can

only be justified on the theory of benefits conferred, and that when there is no benefit, as when the property is taken, and a balance yet remains due, such balance cannot be collected from the property owner. The proposition seems to be fore-closed, however, and it is better, perhaps, that it be not disturbed. The authorities sustaining the front-foot rule, as well as those opposed, will be found collected in note to *City of Raleigh v. Peace,* 110 N. C. 32 (17 Law Rep. Ann. 330, 14 S. E. Rep. 521).

VII. It is said the statutes authorizing the assessment are unconstitutional and void, because they do not provide a uniform method of assessment, because they are not based upon benefits conferred, and because no notice is given the property owner of the filing of the assessment plan. These questions have all heretofore been determined by this court adversely to appellants' contention, and need not be further considered. *Dewey v. City of Des Moines,* 101 Iowa, 416; *City of Burlington v. Quick,* 47 Iowa, 226; *Farwell v. Manufacturing Co., supra; Ford v. Town of North Des Moines,* 80 Iowa, 626; *Amery v. City of Keokuk,* 72 Iowa, 701.

VIII. We now come to the real issue in the case, and that is, did the city, in making said improvement, incur an indebtedness in excess of the constitutional limit? And, if so, may plaintiff avail himself of that fact in this proceeding? We have already called attention to the fact that the city entered into a contract with Flick & Johnson to do the work, in which it agreed to pay them a fixed and definite price. The promise was absolute, and payments were to be made as follows: "Estimates will be made by the board of public works monthly during the progress of the work, and seventy-five per cent. of the actual amount of work done according to such estimates will be paid by said city to the said second party monthly. The remaining twenty-five per cent. will be retained for the period of thirty days after the acceptance of the work, and at the expiration of said period will be paid to said second party by said city;

and said city agrees to accept or reject the work within ninety days after the completion of the whole work provided for in this contract." Payments were made from time to time, as agreed, out of the general revenues or paving-fund account of the city, and at the time the assessment was levied against plaintiff's property there remained due the contractors but three thousand and sixty-three dollars and eighty-seven cents. Bonds had been authorized or issued before that time, as we have stated; but the city was not able to negotiate them until some time in December of the year 1896, and then it sold but ten thousand dollars of the amount authorized. These bonds were on their face an absolute promise to pay, but they bore this condition: "This bond is payable only out of the paving fund created by the collection of said special tax [levied on abutting property], and said fund can be used for no other purpose,   *   *   *   and for the collection and payment hereon of said special tax the full faith and diligence of the city of Davenport is hereby irrevocably pledged." The constitutional inhibition relied upon by appellants is as follows: "No municipal corporation shall be allowed to become indebted in any manner or for any purpose to an amount in the aggregate exceeding five per cent. of the value of the taxable property within such corporation, to be ascertained by the last state and county tax lists previous to the incurring of such indebtedness." Article 11, section 3. It is admitted that the city was indebted to the full limit at the time it made its contract with Flick & Johnson. And it is too plain for serious dispute that the contract created an indebtedness on the part of the city. It is true that that indebtedness was largely paid before the assessment was made against plaintiff's property, but it also appears that none of it was paid at the time plaintiffs commenced their suit. The bonds to which we have referred also constitute a debt, but as they are payable out of a particular fund, viz.: the amount to be raised from the assessment upon the abutting property owners, it is likely they do not fall within the constitutional prohibition. It is the settled rule of this state that, where the

money to be paid upon contracts is provided for to be raised
by taxation upon some fixed and definite scheme, such con-
tract is not within the prohibition. *City of Clinton v. Wal-
liker,* 98 Iowa, 655; *Davis v. City of Des Moines,* 71 Iowa,
500; *Dively v. City of Cedar Falls,* 27 Iowa, 228; *Anderson
v. Insurance Co.,* 88 Iowa, 579; *Grant v. City of Davenport,*
36 Iowa, 396. Flick & Johnson refused to take bonds in
excess of forty per cent. of the contract price, and never in
fact took any, for the reason that the city paid them for their
work from time to time as stated. The cash received for the
ten thousand dollars worth of bonds was turned into the
treasury when received, and at the time of the trial twenty
thousand dollars more of the bonds had been delivered; but
the money for them had not been received, as we understand
it. The assessment was made in February, 1897, during the
pendency of the trial. If the bonds had been issued under
the provisions of section 6, chapter 7, of the Acts of the
Twenty-fifth General Assembly which authorizes the issuance
of such instruments in anticipation of the deferred payment
of taxes levied for such street improvement, to meet the costs
and expenses of such improvement, we would entertain no
doubt of their validity. But such is not the case. The con-
tractors were paid from time to time, as we have seen, and
they have no claim upon the city, except as to the balance
due. Their claim to this balance is absolute, and the city can
make no defense thereto, unless it be that the debt is void
because exceeding the constitutional limit. The real facts
seem to be that these bonds were issued for the purpose
of providing the city with funds from which it might
re-imburse itself for the amounts paid out to the contractors.
These amounts were paid under a contract which clearly
created an indebtedness on the part of the city which was
in excess of the constitutional limit, and it is manifest that
bonds cannot be issued to pay an illegal and unauthorized
debt. It will not do to say that money received from these
bonds is to be paid to the contractors for their work. They

have been paid the larger part of their claim, and all payments have been made in strict accord with the terms of their contract with the city.   Appellees insist that the various provisions of the law with reference to the rights of contractors for street improvements entered into this contract with Flick & Johnson, and that, therefore, no liability was created. But not so, we think.   The city contracted as it would have done had it not been indebted to the full constitutional limit. It agreed to pay a specific sum at a stated time, and recovery could have been had of it under the contract, were it not for the constitutional inhibition.   This provision of the constitution was made to prevent just such contracts, and, were we to sustain this one, it would follow that no contract would be declared invalid, provided the city had the means at some time by which to re-imburse itself.   Moreover, the city in this case did not understand that the law to which we have referred entered into the contract.   It recognized its liability by paying the contract price as it fell due.   The contractors were under no obligation to accept the proceeds of the bonds, nor the amount derived from assessments.   That, as we have seen, they declined to do.   Again, if, perchance, the amount realized from the sale of the bonds or from the special assessments fell below the contract price, who was to bear the loss? Manifestly, the city.   The amount of such loss would certainly be a debt of the city, and therefore illegal.   Suppose the bonds had sold at a discount of, say, 10 per cent., and that they were issued for the exact amount of the cost of the improvement, which, we remark parenthetically, cannot be done (see section 6, chapter 7, Acts Twenty-fifth General Assembly), under the facts disclosed by the record, who would bear the loss?   Manifestly, the city.   Or let us surmise that the amount derived from the special assessments would not pay the cost of the improvement; where would the loss fall? The answer is clear.

To sum up the whole matter, it seems to us that the bonds and the special assessments levied by the city are not

for the purpose of paying the contractors for their improvement,—they have been paid the larger part of that, and hold the city for the remainder,—but to enable the city to re-imburse itself for money paid out to reduce its liabilty on the contract with Flick & Johnson. This is not pursuing a shadow. It goes to the substance of the transaction. It is not a mere matter of form, but a material distinction, which seems very clear to us when we consider the real nature of the transaction. It is said that the city will have the funds with which to pay the bonds when they mature, derived from the special assessments made upon the abutting property. This is, no doubt, true. But the money will not be paid out in satisfaction of indebtedness for the work. It will be taken by the treasurer, and used to pay warrants drawn for some other city indebtedness. The debt to Flick & Johnson will by that time have been fully paid. So that the bonds are issued to pay an indebtedness exceeding the constitutional limit, and the trial court should have declared the contract void, the bonds illegal, and the assessment of no force. It should not be forgotten that this suit was commenced to cancel the contract. It was brought before any great amount of work was done, and before any of the bonds had been sold or the assessments levied. If the case stood on the Flick & Johnson contract alone, there is no doubt that a court of equity should decree its cancellation. How, then, can the fact that the bonds have been issued and partly sold, and an assessment made, cure the illegality? The trial court was evidently of opinion that the debt was at no time an obligation of the city; that the form of the contract was immaterial, provided the amount of money called for thereby could eventually be raised by assessment. We cannot agree to this proposition. The form of the contract goes to the very essence of the controversy, and we have seen how, under some circumstances, the amount called for thereby could not be raised by the city in time to meet its obligations. It is, no doubt, true, as claimed by appellees, that a municipal corporation may

assume an obligation to pay money, without incurring a debt, in a constitutional sense, if payment can and is to be made from the current revenues of the city. *Grant v. City of Davenport, supra,* and *Tuttle v. Polk,* 92 Iowa, 433. But in the case before us the city did not have funds which it could lawfully use to meet the payments as they fell due under its contract with Flick & Johnson. Had it succeeded in negotiating its bonds, it might have paid six-sevenths thereof. But the contractors were not obliged to wait for this negotiation. They proceeded with the work, and demanded and received their money as it fell due. There was no power reserved in the city to stop the work, or to defer payments therefor. It was obliged to pay at a certain time, without qualification or condition. And herein lies the vice of the contract. Again, it is said that, if the city can pay its creditor from any fund which it may lawfully use, then the contract is good. This is, no doubt, true. But this proposition presupposes two elements which are entirely wanting in this case. When the payments matured under the contract the city did not have the money which it could lawfully use to meet them; and, *second,* it did not meet them with money derived for the purpose of paying these obligations. It will not do to say that the test is the condition at the time of the hearing of the case. The real test is, we think, what is the condition at the time the indebtedness is created. Is it a liability which the city can meet from its current funds, or from a special fund derived for that purpose? This is the crucial test, as we understand it. Tried by this test, it is clear that the city incurred a liability which was in excess of the constitutional limit. As further demonstrating the soundness of this position, it may be said that the money used to pay the contractors was taken out of what is called the "Paving Fund Account;" that is to say, from money raised by assessment upon other pieces of property, which was a trust fund, and could not lawfully be used for that purpose. And it further appears that, after crediting this fund with the proceeds of

the sale of the improvement bonds issued in this case, a large deficit remains, which must be raised from some other source. Surely a debt has been created against the city which the constitution was intended to prohibit. In the case of *Water Co. v. Woodard,* 49 Iowa, 58, Mr. Justice Seevers, speaking for the court, said: "If a present indebtedness is incurred or obligation assumed which, without further action on the part of the city, have the effect to create an indebtedness at some future day, such are within the inhibition of the constitution. * * * The obligation of the city is to levy the tax, and see that the amount collected is applied to the specific purposes. If the special fund legally provided is not sufficient, then it may be well said the deficiency is not payable by the city, and it is difficult to conceive that there can be such a thing as a debt which is never to be paid. No burden is created thereby, and there cannot be such an indebtedness. In a constitutional sense, the prohibited indebtedness must be the burden, and payable by the city from funds which could not constitutionally be appropriated to that purpose. Whether the fund legally provided will be sufficient for the designated purpose, we have no means of knowing. Nor is this regarded as material, if no other charge is created on the city by the ordinance." From this quotation we are able to gather the true rule. If the city obligates itself to pay, no matter what its revenues from special assessments, a debt is created, which falls within the constitutional inhibition. If, however, it simply appropriates a part of its revenues, and pledges them to the payment of the obligation, or if it simply undertakes, as trustee or agent, to collect these assessments and apply them upon the work, without liability on its part for anything further, then no debt is created. Or, if it appears that it has on hand at the time the debt is created, a sufficient fund to meet the indebtedness, or if the debt is payable in installments, and it has enough in its hands at the time the installments mature to pay them, then there is no debt in a constitutional sense. See,

as sustaining our conclusion, *City of Council Bluffs v. Stewart,* 51 Iowa, 385; *Quill v. City of Indianapolis,* 124 Ind. 292 (23 N. E. Rep. 788); *Fowler v. City of Superior,* 85 Wis. 411 (54 N. W. Rep. 800); *City of Springfield v. Edwards,* 84 Ill. 626; *City of Valparaiso v. Gardner,* 97 Ind. 1; *People v. May,* 9 Colo. 404 (12 Pac. Rep. 838); *Law v. People,* 87 Ill. 385; *State v. Commissioners,* 37 Ohio St. 526; *City of La Porte v. Gamewell Fire-Alarm Tel. Co.,* 146 Ind. Sup. 466 (45 N. E. Rep. 588).

The contract being void, the bonds issued and the assessments levied to procure funds with which the city might re-imburse itself are also invalid, and should have been so declared by the district court.—REVERSED.

WATERMAN, J., taking no part.